**SUNBEAM CORP. v. MacMILLAN et al.**
No. 5712.

United States District Court
D. Maryland, Civil Division.

Feb. 27, 1953.

J. Cookman Boyd, Jr., Baltimore, Md., Tydings, Sauerwein, Benson & Boyd, Baltimore, Md., Herman T. Van Mell, Chicago, Ill., George M. Chapman, New York City, for plaintiff.

Bernard M. Goldstein, Baltimore, Md., for defendants.

CHESNUT, District Judge.

In this case the plaintiff seeks an injunction and damages against the defendant for breach of a re-sale price maintenance contract under authority of the Maryland Fair Trade Law. Flack's Annotated Code of 1951, Art. 83, §§ 102 to 110. The plaintiff is an Illinois corporation which for 20 years or more has manufactured and distributed electrical household and other appliances under the registered trade-mark name and brand name of "Sunbeam". It manufactures and distributes its product on a national basis in all States that have a so-called fair trade law. Maryland, Delaware and all the States of the Union except three or four, have such fair trade laws. The plaintiff maintains a national policy of uniform price re-sale maintenance. It sells its product primarily only to wholesalers in various States who by their contracts with the plaintiff are authorized and permitted to re-sell only to retailers who have executed re-sale price maintenance contracts and agreements with the plaintiff. During past years the plaintiff has expended approximately $15,000,000 in national advertising. Many of its dealers also in addition advertised Sunbeam products. At the present time the plaintiff is expending about $1,000,000 a year in national advertising. Its products consist among other things of electric kitchen utensils, some garden tools and electric razors. Over a period of years its gross sales have increased greatly until now they are in the aggregate about $67,000,000 annually. The plaintiff does not sell directly to retailers but when a retailer in a particular State having a fair trade law, as in Maryland, executes an agreement to maintain minimum re-sale prices, that retailer is authorized to buy from wholesalers who obtain the plaintiff's product under contracts between them. The wholesaler is, of course, entitled to re-sell to retailers at an authorized discount but the retailers are bound by their individual contracts to maintain the re-sale prices of which they are notified from time to time by the plaintiff. They are not authorized to give any discount or otherwise from the authorized minimum re-sale price. Plaintiff's trade-mark and brand name of "Sunbeam" has acquired through this policy of national advertising and re-sale price maintenance a very great value and an unauthorized breach of the re-sale maintenance contracts would clearly constitute a very substantial damage to the good will which it has built up through its sales policy.

838

The defendant is a small retail dealer in electrical and other appliances with business in Elkton, Cecil County, Maryland. It has executed a re-sale price maintenance agreement with the plaintiff and is thereby authorized to obtain the plaintiff's products from wholesalers at the usual wholesale discount price to retailers. The case has been heard upon the pleadings and evidence and oral arguments and briefs of counsel for the parties. The proof shows without doubt that the plaintiff's re-sale price maintenance policy in distributing its products is in accordance with the conditions outlined in the Maryland law. It is in active competition with other manufacturers of similar products and the agreements which it makes with regard to re-sale price maintenance are entirely on the so-called "vertical" level and not at all on the "horizontal".

The defendant's contract with the plaintiff has been filed in evidence as plaintiff's Exhibit No. 5. It is on a printed form headed "Sunbeam Retailers Fair Trade Contract", dated June 25, 1951 between the Sunbeam Corporation and MacMillan & Sons, North Street, Elkton, Maryland. The defendant, however, is now the sole proprietor of his business. It recites that the plaintiff is a distributor under its trademarks brands or names of "Sunbeam" etc., and the "Retailer is engaged in the sale of such products to consumers for use, and the parties desire to avail themselves of the lawful merchandising methods authorized by the Fair Trade Acts and the Acts of Congress now and hereafter in effect and particularly the Fair Trade Act of the State in which Retailer's principal office is located"—. Paragraph 2 of the agreement reads as follows:

"Retailer will not (except as specifically permitted by statute) advertise, offer for sale or sell Producer's products (described in the Supplement furnished herewith, or in such Supplement as it may from time to time be amended) acquired by Retailer while this contract is in effect, at less than the minimum retail selling price stipulated therein, plus on each sale the amount of any applicable sales, use, excise, or similar taxes."

And the last paragraph of the printed agreement (10th) provides:

"This agreement shall only apply to sales, offers or advertisements within states, or for delivery in states where agreements of the character of this agreement shall be lawful under any statute, law or public policy now or hereafter in effect. It shall be binding upon the successors and assigns of the parties."

The agreement was signed by the Sunbeam Corporation as producer and by the defendant as Retailer. Other paragraphs of the agreement implementing and incidental to the main purpose of the contract are not in point in this case.

The contract provided also that it might be terminated on ten days' written notice by either party to the other. It has not been terminated.

I find from the evidence that the defendant has breached this contract in that he has admittedly sold on two occasions the plaintiff's products at less than the authorized minimum retail selling price stipulated to persons whom he described as "friends" and which sales were admittedly in violation of the contract. In a much larger amount, however, the defendant has also breached the contract in that he has sold $10,000 worth of the plaintiff's products to Klein's Discount House in Wilmington, Delaware, at a discount of about 40% from the authorized minimum sales price. The defendant seeks to justify these latter transactions with Klein as merely exchanges of merchandise from one Retailer to another and contends that they were not a breach of the contract because (1) they were not sales to a consumer and (2) that they should be excluded from the contract because they were interstate sales, that is, sales to Klein in Delaware which State, however, has a fair trade law similar to that of Maryland. Klein has not made any agreement with the plaintiff or the defendant with respect to re-sale prices and the evidence shows that the trade under-

standing of a "discount house" means one which generally sells commodities, including particularly the well-known brands, at less than the established prices. The defendant further explains his dealings with Klein by saying that some time ago when he was very short of capital and his business was on the verge of failing because he could not keep on hand a sufficient inventory, Klein had helped him by providing him with goods on consignment with permission to sell and account for the proceeds by paying Klein the cost plus ten per cent. and that this practice was continued from time to time, the balance of exchanges being substantially more received by the defendant than by Klein for what he sold or exchanged with Klein.

I find no legal merit in the defendant's contention that he was at liberty to sell to a Retailer or any one at less than the plaintiff's established minimum prices. That construction of the contract is not permissible under its plain wording which prohibits the re-sale of plaintiff's products acquired by the defendant (Retailer) "at less than the retail minimum price stipulated therein". Nor can I see any merit in the defendant's contention that the transactions with Klein were not sales but only exchanges. Obviously they were sales even though called "exchanges".

The only question that calls for discussion in this case arises on the defendant's con-tention that his sales to Klein were not a breach of his contract with the plaintiff. But whether the defendant made deliveries to Klein in Maryland or in Delaware did not clearly appear on the evidence, as I recall it. If the deliveries or some portion of them were made to Klein in Maryland there would be no need to discuss this latter point; but for the purpose of the discussion I will assume that some or most or indeed all of the deliveries were made to Klein in Delaware.

Counsel for the parties have discussed this point of the case primarily as arising under the well-known Miller-Tydings Amendment by Congress in 1937 to the Sherman Anti-Trust Law, 15 U.S.C.A. § 1, which in short effect exempts re-sale price maintenance contracts as authorized by State fair trade laws from what would otherwise have been their illegality as unlawful restraint of interstate trade. But in my view the more direct approach to the problem arises on the application of the Maryland statute. The jurisdiction of the court in this case is based on diverse citizenship only and therefore we must first consider the terms of the Maryland statute and its interpretation and application by the Maryland Court of Appeals, Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.[1]

There have been several decisions of the Maryland Court of Appeals upholding the

1. The Maryland statute, Flack's Annotated Code of Maryland of 1951, Vol. 3, Art. 83, §§ 102–110, was first enacted in 1935 with subsequent amendments. The principal sections here in point are 103 and 107, which read as follows: "103. No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, or the vending equipment from which a commodity is sold to consumer bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Maryland by reason of any of the following provisions which may be contained in such contract:

"(A) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller. "(B) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller. "(C) That the seller will not sell such commodity: "(1) to any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

validity of the statute against both state and federal constitutional provisions, and applying and enforcing it against defendants who have wilfully and knowingly violated minimum re-sale prices authorized by manufacturers of articles bearing trade-mark or brand names. Most of the Maryland cases have been decided upon the pleadings generally by demurrer to a bill for an injunction or to the answer thereto and therefore the decisions do not fully state the facts of the particular case, but nevertheless the decisions have included enforcements of the Act against wilful and knowing price cutters even though they have not personally signed the contract with the manufacturer and in at least some of the cases one or two sales alone have been held sufficient to justify the issuance of an injunction. Goldsmith v. Mead, Johnson & Co., 1939, 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339; Schill v. Remington-Putnam Book Co., 1940, 179 Md. 83, 17 A.2d 175, 22 A.2d 128; Schill v. Remington-Putnam, 1943, 182 Md. 153, 31 A.2d 467, 32 A.2d 296; Hutzler Brothers v. Remington-Putnam, 1944, 184 Md. 327, 40 A.2d 823; Hutzler Brothers Co. v. Remington-Putnam, 1946, 186 Md. 210, 46 A.2d 101, 163 A.L.R. 884, and Donner v. Calvert Distillers Corp., Md.1950, 77 A.2d 305.

Prior to the passage of the Miller-Tydings Act of 1937 re-sale price maintenance contracts had been held by the Supreme Court to be a violation of the Sherman Anti-Trust Act. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. The prior federal decisional law in this respect was succinctly summarized by Mr. Justice Douglas for the majority opinion of the Supreme Court in the case of Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 386, 71 S.Ct. 745, 746, 95 L.Ed. 1035, as follows:

"It is clear from our decisions under the Sherman Act, 26 Stat. 209, 15 U.S.C.A. §§ 1–7, 15 note, that this interstate marketing arrangement would be illegal, that it would be enjoined, that it would draw civil and criminal penalties, and that no court would enforce it. Fixing minimum prices, like other types of price fixing, is illegal *per se*. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259 [95 L.Ed. 219]. Resale price maintenance was indeed struck down in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress."

But for some years before 1937 there was much economic thought that public policy should sustain re-sale price maintenance in the interstate or national marketing of goods produced under established trade-marks and brand names provided the producers were in active competition with other products of the same general class, and provided agreements in support of the policy were made only on the so-called "vertical level" and not on the "horizontal level", that is to say, agreements should be permissible between manufacturers, wholesalers and retailers, but not between producers and producers or wholesalers and wholesalers, or retailers and retailers. The history of the development of this economic thought and its final success in the enactment of the Miller-Tydings Amendment to the Sherman Act are set out at length in the majority and dissenting opinions in the Schwegmann case, including the appendix to the dissenting opinion of Mr. Justice Frankfurter. See also Chap-

"(2) to any retailer, unless the retailer will agree not to resell the same except to consumers for use at not less than the stipulated minimum price."
"107. Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of Sections 102–110, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

ter 9, Vol. 1, Toulmin's Anti-Trust Laws, pages 225, 231, entitled "Miller-Tydings Act—Congressional History".

██ The Miller-Tydings Act becomes important and relevant in the present case only in this way. If the Act had not been passed the Federal Anti-Trust Act would have been a clear defense to this suit but, shortly stated, the effect of that Act was to exempt fair trade laws of the class mentioned from what would otherwise have been their condemnation under the Sherman Act. The defendant's contention here seems to be that when properly construed the Miller-Tydings Act only legalized interstate sales in accordance with a re-sale maintenance price policy by a manufacturer or distributor to wholesalers or retailers involving *interstate* sales to them and has no application to interstate sales made by retailers to interstate *buyers*. That is to say, the Miller-Tydings Act legalized interstate original sales *from* one state to another but did not legalize *re-sales* by the retailer in a particular state, subject to a fair trade law, to *out of state buyers*. The only federal judicial decision cited in support of this contention is Sunbeam Corp. v. Wentling, 3 Cir., 1951, 185 F.2d 903. In that case the defendant, Wentling, conducted a mail order house in Pennsylvania and made sales therefrom both in Pennsylvania and other states at prices less than those authorized by Sunbeam as the manufacturer. Wentling had not signed any contract or agreement to maintain minimum prices. In its first opinion in the case the court enjoined Wentling from price-cutting in intrastate sales but concluded that the Miller-Tydings Act should not be construed to legalize interstate re-sales because that would constitute an undue restraint on interstate commerce. In my opinion that decision is not applicable to the present case for several reasons.

In the first place it may be noted in passing that the court was there dealing with the Pennsylvania Fair Trade Law where here we are dealing with the Maryland statute although I assume that there is no great difference between the two. More importantly, however, it is to be noted that Wentling was a so-called non-signer of any contract, while in the instant case the defendant is a signer. Again, Wentling conducted business as a mail order house from which it may be inferred that he was re-selling in many different states, while in the present case the defendant has re-sold only to Delaware which has a fair trade law substantially like that of Maryland.

Another reason for the non-applicability of the Wentling case to the instant case is this. Some part of the reasoning there is that the fair trade laws of the several states are not entirely uniform and that there might be different minimum price sale restrictions in different states, as a result of which a retailer in one State would be embarrassed to know whether re-sales in particular States would or not be contrary to the re-sale price policy differing in the several states. I have not understood that such differing minimum re-sale prices were created by statutory law in the different States, but if they exist at all it would be due to the policy of the particular manufacturer. However, in the instant case we have no such difficulty because Sunbeam's re-sale maintenance contracts are of national uniformity. The contracts are made only in States having a fair trade law and in accordance with that law, and the contracts are uniform in their provisions in all States with the exception of the dates of the contract and the names of the retailers who sign them. And Sunbeam's uniform policy is to sell only to wholesalers under uniform contracts as to re-sale to retailers, and to only those retailers who execute the uniform re-sale contracts.

But there are even more important reasons for what I think is the inapplicability of the Wentling decision to this case. The Supreme Court granted certiorari in the case and pending its decision thereon decided the Schwegmann case which, for the first time, held that the Miller-Tydings Act did not apply to dealers who had not *signed* any contract with the manufacturer to maintain re-sale prices. Thereafter and because of the decision in the Schwegmann case, apparently alike applicable to the

842

Wentling case, the Supreme Court vacated the Third Circuit's decision and remanded the case for further consideration in the light of the opinion in the Schwegmann case, 341 U.S. 944, 71 S.Ct. 1012, 95 L.Ed. 1369. Thereafter the Third Circuit in Sunbeam Corp. v. Wentling, 192 F.2d 7, dismissed the original suit of the Sunbeam Corporation against Wentling because as a non-signer he was not within the provisions of the Miller-Tydings Act at all.

But there is still further important reason for the non-applicability of the Wentling case here. The judicial decisions in Schwegmann and Wentling gave much concern to the advocates of re-sale price maintenance as to a form of interstate or national distribution of trade-mark and brand articles of commerce. As a result Congress passed the so-called McGuire Act of July 14, 1952 as an amendment to section 5 of the Federal Trade Commission Act. See 15 U.S.C.A. § 45, and also United States Code Congressional and Administrative News of 1952, p. 602, and the legislative history thereof, pp. 2181 et seq. It is quite unnecessary to resort to the legislative history of this Act to understand very clearly the definitely expressed view and policy of Congress in support of the Miller-Tydings Act of 1937, as the language of the Act is, I think, clear and explicit. The purpose of the Act is stated in the first paragraph as follows:

"That it is the purpose of this Act to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce."

Section 2 amends section 5 of the Federal Trade Commission Act by providing in effect in subsections (a)(1), (2) and (3) language quite similar to that of the Miller-Tydings Act; but in subsection (4) there is additional provision reading as follows:

"(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right or right of action as described in paragraph (3) of this subsection shall constitute *an unlawful burden or restraint upon, or interference with, commerce.*" (Italics supplied.)

The significance of this last provision is more clearly understood when reference is made back to the reasoning of the Wentling case in the Third Circuit above referred to. It will be recalled that the view there expressed was that the Miller-Tydings Act should not be construed to apply to re-sale interstate because that would constitute a restraint on the freedom of interstate commerce. The language of subsection 4 seems very clearly to indicate that in this McGuire Act clarifying and reaffirming the Miller-Tydings Act, Congress was expressing its public policy to the contrary of the Wentling decision on that point. And if this view needs reinforcement it is found in the report of the House Committee on Interstate and Foreign Commerce (Report No. 1437 to accompany H.R.5767) with regard to the McGuire Act in which referring to subparagraph (4) it was said:

"This is a new paragraph, included because of the Wentling case referred to above. It provides that neither the making of a contract as directed in paragraph (2) nor the exercise or enforcement of any right or right of action as directed in paragraph (3) shall constitute an unlawful burden or restraint upon, or interference with, interstate or foreign commerce." (See report No. 1437—82nd Cong. 2d Sess. Feb. 27, 1952).

And the intent of Congress in expressing the purpose of the Act was even more

fully stated on page 2 of the Report as follows:

"The end result of the Supreme Court decision has been seriously to undermine the effectiveness of the Miller-Tydings Act and, in turn, of the fair-trade laws enacted by 45 states. H.R.5767, as amended, is designed to restore the effectiveness of these acts by making it abundantly clear that Congress means to let State fair-trade laws apply in their totality; that is, with respect to nonsigners as well as signers.

"The bill further provides that the application of these State laws to interstate transactions shall not constitute a burden upon interstate commerce. The purpose of this provision is to remove any obstacle, as far as Federal law is concerned, which might stand in the way of a broader interpretation of State fair-trade laws so as to make them applicable to *retail transactions and retail advertising which cross State lines.* The possible existence of such an obstacle was suggested by the United States Circuit Court of Appeals for the Third Circuit in its recent decision in Sunbeam Corporation v. Wentling, 1950, 185 F.2d 903. In that case the court held that the Pennsylvania law should not be construed to apply to sales by Pennsylvania retailers to consumers in other States, or to advertisements in publications published in other States, because, so construed, the Pennsylvania statute might be considered a burden upon interstate commerce and might, therefore, be declared unconstitutional." (Italics supplied.)

It will also be noted that by the McGuire Act Congress definitely provided that re-sale price maintenance policy in accord with and subject to the limitations of the Miller-Tydings Act should be effective and binding on persons "who are not parties thereto", thus in effect changing, at least as to the future, the result of the Schwegmann case which had held that the Miller-Tydings Act was not effective against non-signers.

In writing the Miller-Tydings and the McGuire Acts Congress had in mind the boundaries between Federal and State power. As to the Anti-trust Acts Congress had full constitutional power under the Interstate Commerce clause; but as to activities within the State the Federal power extended only to such activities as directly and appreciably affected interstate commerce. The plainly expressed purpose and policy of Congress in writing the two Acts was to remove the ban of anti-trust laws from interstate re-sale price maintenance policies conducted within the limitations of the Acts. But Congress had no power to validate such price maintenance if the law of a particular State was to the contrary. And as the fair trade laws of the States were not entirely uniform and as a few of the States did not have any fair trade law, it was necessary in the Acts to recognize that State policy might be opposed to price maintenance. To construe these Acts of Congress to prohibit re-sales interstate as restraints on interstate commerce seems to me to be quite inadmissible. In effect it would probably quite destroy re-sale maintenance although quite in accord with a particular State policy. And the injunction sought in this case is not against re-sale interstate by the defendant but against any sales below the stipulated minimum prices.

■ It is not disputed by counsel for the defendant that the effect of the McGuire Act was to reverse by legislation the interpretation of the Miller-Tydings Act as judicially announced in the Schwegmann case as to nonsigners and the Wentling case as to interstate re-sales, but his contention is that the McGuire Act can be given no effect here because it was not passed until a few months after the institution of this particular suit, and a longer time after the interstate re-sales by the defendant. If it be assumed that the contention is sound with respect to plaintiff's claim for damages it is, I think, clearly unsound with respect to the prayer for an injunction which, of course, operates in futuro. I see no constitutional objection to giving effect to the McGuire Act in this case with respect to the injunction prayed

for. A number of cases have ruled to this effect. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349; American Steel Foundries v. Try-City Central T. Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189; Texas Co. v. Brown, 258 U.S. 466, 42 S.Ct. 375, 66 L.Ed. 721.

■ Returning again to the application of the Maryland statute and the decisions thereon, I find nothing in them to support the defendant's contention that re-sales interstate must be excluded from the claim of the provision of paragraph 2 of the contract which prohibits re-sales by the defendant at less than the stipulated minimum prices.

■ Paragraph 10 of the agreement has also been quoted above. It provides that the agreement shall apply only "within the states, or for delivery in states where agreements of the character of this agreement shall be lawful". It is perhaps not clear that this last paragraph has any reference to re-sales for delivery in other states. It was a printed form of contract evidently prepared by the Sunbeam Corporation for signature by retailers in various States and the probable significance of the clause as a whole is merely to indicate that Sunbeam did not intend to contract for re-sale price maintenance except with retailers in States having fair trade laws. However, if the paragraph has any significance to the territory in which re-sales are to be made, it would seem to imply that such re-sales could be made only to purchasers in States having similar fair trade laws. As we have seen, Delaware has a fair trade law similar to that of Maryland.

For these reasons I conclude that the injunction prayed for by the plaintiff must be granted. I inferred from the argument of counsel that the plaintiff is much more interested in establishing the validity and enforceability under the Maryland law of the contract by enjoining future violations than to recover damages for past violations. Counsel may therefore submit an appropriate decree for the injunction. If the plaintiff wishes to insist upon an inter-locutory decree for damages to be hereafter assessed and ascertained, that can be given further consideration; but in view of the nature of the case as a whole, I am not presently disposed to include an inquiry as to damages in the decree. The taxable court costs should be imposed upon the defendant.

■ I will add that under the Maryland decisions it is my opinion that the two sales by the defendant, in admitted violations of the contract, are sufficient to warrant the issuance of the injunction, especially in connection with the defendant's justification of his alleged right to continue to violate the provisions of the contract in more substantial amounts. But in view of the importance of the question with regard to re-sale interstate, I have thought it desirable to discuss this larger feature of the case at some length.

Counsel may submit the appropriate decree in due course.