GENERAL ELECTRIC COMPANY,
Plaintiff,

v.

MASTERS MAIL ORDER COMPANY OF WASHINGTON, D. C., Inc.,
Defendant.

United States District Court
S. D. New York.
Sept. 29, 1956.

**58**

White & Case, New York City, Edgar Barton, Howard Aibel, New York City, of counsel, for plaintiff.

Joseph F. Ruggieri, Brooklyn, N. Y., Thurman Arnold, Norman Diamond Arnold, Fortas & Porter, Washington, D. C., of counsel, for defendant.

BICKS, District Judge.

Plaintiff, General Electric Company, a New York corporation, here seeks an injunction against Masters Mail Order Company of Washington, D. C., Inc., a Maryland corporation.[1] To support its claim, G. E. argues that Masters advertises, offers for sale, sells and delivers G. E. appliances, for example, in New York below resale prices fixed by G. E. in contracts with other New York retailers pursuant to New York's Feld-Crawford Act.[2] As a result, G. E. claims Masters has damaged G. E.'s "lawful distribution system and the maintenance of its retail fair trade program in New York," and other states with like fair trade laws.

In reply, Masters urges principally that Feld-Crawford, along with similar state "fair-trade" laws, do not proscribe its conduct in "fair-trade" states. Were state "fair-trade" construed to cover Masters' sales, defendant goes on, such state laws would impose an undue burden on interstate commerce and must, under the Supremacy Clause, Const. art. 6, cl. 2, fall by reason of the Sherman Act.[3] To these issues I now turn.

Feld-Crawford, in relevant part, makes "actionable" at the suit of any "person damaged thereby * * * advertising, offering for sale or selling any commodity" below resale prices fixed in accord with Feld-Crawford's terms. Do Masters' activities, then, come within Feld-Crawford's ban?

Since the enactment of the McGuire Act,[4] the parties here stipulate, "G. E. has entered into over 12,000 written fair trade agreements with retailers, including over 1,200 in New York and New Jersey alone." G. E.'s contracts, Masters also agrees, cover only appliances "in fair and open competition * * * with appliances of the same general class produced by others." And, the parties stipulate, "G. E. has systematically and repeatedly given notice" of "fair-trade" agreements as well as "diligently and vigorously enforced" their terms. As part of this enforcement plan, "G. E., since July 14, 1952, has instituted in excess of 834 * * * [court] actions * * * including 410 in New York and New Jersey."

One of these enforcement suits, brought in New York in late 1952, was against Masters Inc., a New York retailer. In that action, Masters (New York) was enjoined from violating G. E.'s fair-trade agreements. For flaunting that state court injunction, Masters (New

---

1. The demand for a money judgment was withdrawn at trial.

2. N.Y. General Business Law, McK.Consol. Laws, c. 20, 369-a et seq.

3. 15 U.S.C.A. §§ 1–7, 15 note.

4. 15 U.S.C.A. § 45.

York) was fined twice in early 1953. A few months later, Masters (New York) organized defendant here, Masters (Maryland). Masters (New York) owned all Masters' (Maryland) stock. The same man served as President of both companies. About a year later, but after suit here, the parties stipulated that "defendant was dissolved as a Maryland corporation." And since then, its "business * * * has been carried on by a corporation bearing the same name but organized under the laws of the District of Columbia * * *"

Soon after these corporate convolutions, Masters itself emblazoned its purpose in advertisements scattered throughout New York:

"It's becoming a crime to offer bargains, Masters recently paid * * * a penalty of $1750 to G. E. for cutting fixed prices * * * Masters had continued to give its customers bargains despite court orders so that the discount house was found guilty and had to pay the penalty.

"Masters Mail Order Company of Washington, D. C. Inc. has been established in Washington, D. C. because it is a non fair trade area. This means we are permitted from Washington, D. C. to offer you anywhere in the country sensational discounts on famous brands."

To insure its goal of frustrating Feld-Crawford, Masters (New York) dictated the every move of Masters (Maryland). Thus, according to the parties' stipulation, the "President, Vice President, Secretary" and "Treasurer" of Masters' (Maryland) were "all * * * officers, employees, directors or agents of" Masters (New York). These officers of Masters (Maryland), the parties further agree, continued to occupy the very New York Office space "occupied by them as officers, directors, employees or agents of" Masters (New York). Masters' (Maryland) "books and records", its "cash receipts and cash disbursements, general ledger, unpaid bills file" and "duplicate sales tickets" were kept at offices of Masters (New York). A "daily report" of defendant Masters' "receipts, cash disbursements and shipments" was sent on to Masters (New York). Indeed, the only person authorized to sign checks on "defendant's behalf" was the very individual who served as principal officer of Masters (New York). It was he who, defendant agrees, "supervised defendant's business by regular daily telephone calls * * * by mail," and by visits to Washington. From all this an unblurred picture emerges: Though puppet Masters (Maryland) held the Washington stage, its strings were pulled by Masters (New York).

It is against this background of defendant's birth and life as a convenient creature of Masters (New York) that defendant's activities take on their true meaning. Building again on stipulated facts, "Defendant's President," the top official of Masters (New York), "had supervision and control of the preparation and publication" of defendant's "mailing piece[s]." This "supervision and preparation," moreover, "was principally carried out" in offices of Masters (New York). These "mailing piece[s]" typically proclaimed that "Masters recently paid * * * a penalty · * * * to G. E. for cutting fixed prices"; that "Masters Mail Order Company * * * has been established in Washington, D. C., because it is a non fair trade area"; that "[t]his means *we* are permitted from Washington, D. C. to offer you anywhere in the country sensational discounts on famous brands"; and that, to exploit this opportunity, recipients should "use the handy order form." [*Underscoring* added.] Some "325,000 copies" of this circular were "printed" in New York, "delivered to Masters" (New York), and "addressed" "at the request of" Masters' (New York) officials, with "Addressograph plates owned by Masters" (New York), to "persons on the mailing list of Masters (New York)." With "postage charges" paid initially by Masters (New York), these circulars "were shipped by truck to Washington, D. C., and from there were mailed to

prospective customers in New York, New Jersey, and other fair trade States."

Again, the parties have stipulated that "preparation" of the "order blanks" was "supervised," and "controlled" and paid for in New York by officials of Masters (New York). Some copies "were sent to defendant * * * in Washington, D. C." Others "were retained by Masters (New York)" and "kept * * * behind the appliance counter at its place of business in New York City * * *" These copies "were distributed by" Masters (New York) "employees * * * at its New York store" to persons who sought to buy G. E. appliances at less than fair trade prices or who asked for order blanks for "your Washington store." Moreover, the stipulation goes on, "Masters' employees were instructed to inform such persons that if they so desired they could obtain GE fair traded appliances at less than fair trade prices from defendant by mail orders sent to the District of Columbia." Following up such inquiries from Masters' (New York) customers who sought "GE appliances at less than the fair trade price," Masters (New York) wrote each a letter "accompanied by copies of * * * [Masters' (D. C.)] mail order form with the mail order patron typed in by an employee of Masters (N. Y.)." Finally, "In at least one instance, an employee of Masters of New York wrote in the name of a prospective New York purchaser on an order blank and mailed it to the purchaser to be filled in, signed and forwarded to Masters of Washington." [5]

■ Masters' (Maryland) "order blanks" then were passed out over the counter in Masters' (New York) store. Further, Masters' (Maryland) advertising letters were posted in New York to Masters' (New York) New York customers directing them to Masters (Maryland). This much, standing alone, would suffice to make up "advertising" within Feld-Crawford.

But Masters (Maryland) did more. Posting some 300,000 copies of its "mailing piece," prepared in New York, printed in New York, addressed in New York to "persons on the mailing list of Masters (New York)" also constitutes "advertising". Feld-Crawford cannot be dodged by the "gimmick" of posting in Washington. No more than if a company's nearest post office was across a state line, or if an "ad", posted in New York and addressed to a customer in New York chanced as a matter of postal convenience to traverse another state, can defendant's Washington mailing circumvent Feld-Crawford. Defendant's "object," as one court reasoned in an analogous case, "could not be attained except by delivery of the matter to prospective customers * * * [T]his end could as well be reached by use of the mails as by the physical presence of the absent dealer in the state." [6] Clearly, Masters' (Maryland) activities constitute "advertising" in New York within Feld-Crawford.

Defendant's activities, in like fashion, fall within Feld-Crawford's ban on "offering for sale or selling" in New York below "fair trade" prices. Indeed, defendant's "ad" concededly mailed to New Yorkers, proclaims, "we * * * *offer* you * * * Sensational discounts on famous brands." Corroborating this ad's design as an offer, Masters (New York) advised would-be purchasers of G. E. appliances: "Thank you for your recent mail order * * *. A court injunction obtained against us * * * prevents us from selling this merchandise to you at below the Fair Traded List Price

5. General Electric Co. v. Masters Mail Order Co., D.C.S.D.N.Y.1954, 122 F. Supp. 797, 799–800. Masters (New York) connection with defendant's operations are indeed so close that this Court, in an analogous proceeding involving principally defendant Masters' operations, felt that a "searching inquiry" was required to determine whether Masters (New York)

was in contempt of its New York injunction. See Sunbeam Corp. v. Masters, Inc., D.C.S.D.N.Y.1954, 124 F.Supp. 155, 160.

6. State v. Davis, 1915, 77 W.Va. 271, 87 S.E. 262, 265, L.R.A.1917C, 639; see United States v. Thayer, 1908, 209 U.S. 39, 43, 28 S.Ct. 426, 52 L.Ed. 673.

* * * Masters Mail Order Company of Washington, D. C., Inc., *offers* the merchandise you ordered at a substantial discount."[7] [Italics added.] All that was left for the New York customer to do was insert his name, address and specify the appliance desired on the accompanying order form. A New Yorker's mailing this order form here converted defendant's offer to a contract to sell.[8]

True, defendant's mail order forms state "This order is subject to acceptance by Masters Mail Order Company, Inc., in Washington, D. C." Equally true, however, there is no evidence this caveat has any semblance of a business meaning: The record reveals not one instance where defendant in fact did not accept a customer's offer or even questioned his credit.[9] In this context, then, as the Supreme Court put it, "acceptance was a mere formality, since one hardly incurs the cost of soliciting orders to reject." [10]

Responding to these orders, defendant's mailing of appliances to New Yorkers constituted "selling" in New York. At the outset, title passed here. Thus, Uniform Sales Act Section 19 specifies that "[i]f the contract to sell requires the seller to deliver the goods to the buyer * * * or to pay the freight or cost of transportation to the buyer * * * the property does not pass until the goods have been delivered to the buyer * * *." [11] Defendant's practice, of course, is "to deliver the goods to the buyer" in New York. On these New York deliveries defendant did not charge or collect the District of Columbia sales tax.[12] Its mail order forms, moreover, explain, "It is understood that there is no charge for shipping". In accord with settled law, then, title passed in New York.

■ More important than such divinations as to title's passage, Feld-Crawford's design can best be gauged in terms of the mischief it sought to remedy. Feld-Crawford's prime aim, as the New York Court of Appeals expressed it, " 'is to protect the property—namely, the good will—of the producer, which he still owns. * * *' (Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 193), 57 S.Ct. 139, 144, 81 L.Ed. 109."[13] That Act, the New York high court went on, "was manifestly aimed and designed to protect the good will of the owner or producer from injury when his trade-mark or name is employed in the resale of goods originally owned or produced by him. * * * 'It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates "unfair competition." ' "[14] Applying that policy, the New York Court of Appeals has "squarely held that the statute applies to nonsignatories in interstate commerce";[15] and specifically to out-of-state mail-order sales by a New York retailer.[16] The New York Court of Appeals, then, has proclaimed

---

7. Rec., Ex.'s E, F.

8. Restatement of Contracts, § 25(3).

9. Cf. 1 Corbin, Contracts § 33 (1950).

10. Miller Bros. Co. v. Maryland, 1954, 347 U.S. 340, 346, 74 S.Ct. 535, 540, 98 L. Ed. 744.

11. New York Personal Property Law, McK.Consol.Laws, c. 41, § 100.

12. D.C. Tax Regl. § 401(1), 1 D.C. Register 9 (July 19, 1954), P–H D.C. Tax Serv. Par. 21, 540, 60.

13. Guerlain, Inc., v. Woolworth Co., 1947,

297 N.Y. 11, 17, 74 N.E.2d 217, 218. See also Bristol Meyers Company v. Picker, 1950, 302 N.Y. 61, 96 N.E.2d 177, 22 A. L.R.2d 1203, Port Chester Wine & Liquor Shop v. Miller Bros., 1939, 281 N. Y. 101, 22 N.E.2d 253.

14. Guerlain v. Woolworth, supra, 297 N.Y. at page 18, 74 N.E.2d at page 219.

15. General Electric Co. v. Masters, Inc., 1954, 307 N.Y. 229, 241, 120 N.E.2d 802, 806.

16. Raxor Corp. v. Goody, Sup., 121 N.Y.S. 2d 882, affirmed, 1954, 307 N.Y. 229, 240, 120 N.E.2d 802.

Feld-Crawford's design, and their construction binds this Court.[17]

It is that design which defendant's actions blatantly thwart. Originally, to repeat, Masters (New York) sold the very appliances at the same below fair trade prices to the very New Yorkers to whom defendant now sells. When the New York State Court enjoined Masters (New York), defendant Masters took over. Under the close rein of Masters (New York), defendant advertised, not in newspapers or magazines that reached New Yorkers, among others, but instead over the counter of Masters (New York) or via direct mailings prepared in New York by its New York parent and directed expressly to New Yorkers. Moreover, "part" of the very appliances sent New Yorkers, defendant stipulates, had "been acquired from Masters (New York)" and shipped to Washington with an eye toward re-sale back to New Yorkers. Thus, though the form was altered, the substance was not. It was still in New York that defendant's goods were advertised, sold and delivered. It was in New York, moreover, that the effect of the very impact New York's Legislature proscribed was intended and felt. For Feld-Crawford to be anything short of a dead letter, defendant's activities must be held within its terms.

■ Feld-Crawford, so construed, finds sanction in the McGuire Act. McGuire seeks, in the language of its preamble, "to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce." [18]

Implementing that purpose, McGuire paragraph (a) (3) exempts from antitrust interdiction the exercise of any right of action "created by * * * any State, [against] wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements * * *." And, McGuire paragraph 4 specifies exercise of such rights of action shall not "constitute an unlawful burden or restraint upon, or interfere with, commerce."

Paragraph 4's "purpose", the House Committee Report explained, "is to remove any obstacle, as far as Federal Law is concerned, which might stand in the way of a broader interpretation of State fair-trade laws so as *to make them applicable to retail transactions and retail advertising which cross state lines.*" [19] (Emphasis added) To insure this goal, the House Committee modified the McGuire Bill. McGuire, as introduced, specified fair trade contracts might apply " ' * * * to persons *within the State* even though such persons are not parties thereto.' " (Emphasis supplied) Stricken by the House Committee, however, were the words "within the state." Thus, McGuire as reported out by the House Committee provided simply that fair trade contracts might bind "persons who are not parties thereto." And, settling the intent of the House, the House rejected a proposal to bar any cause of action with respect to interstate movements or commodities into or out of non-fair trade territory.[20] Finally, construing McGuire's language on the floor of the Senate, Senator Humphrey explained [21] "The bill will have this effect. It

---

17. Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

18. 66 Stat. 631–632 (1952).

19. H.R. Rep. No. 1437, 82d Cong., 2d Sess. 2 (1952).

20. 98 Cong.Rec. 4946. See also H.R. Rep. 1516, 82d Cong., 2d Sess. 17 (1952).

21. 98 Cong.Rec. 8887.

will require that where there are trade or branded names on which fair-trade prices have been established the mail-order house will sell them at those prices in any State, just as the local retail man is required to do."

Against this background, too clear for a challenge is that McGuire, as a learned brother has put it, was designed "to open all interstate commerce to the operation of State and fair trade acts * * *."[22] It is now settled law that a state may validly enforce its fair trade laws against a nonsigning local vendee who sells into another state.[23] Though defendant here is located in a non-fair trade jurisdiction, its contacts with New York permeate its every operation and, viewed as a whole, compel the conclusion that defendant has made New York "resales" within Mc-Guire.

It is the very pervasiveness of defendant's New York operations that distinguishes this case from Bissell Carpet Sweeper Co. v. Masters Mail Order Co., D.C.Md.1956, 140 F.Supp. 165 and Revere Camera Co. v. Masters Mail Order Co., D.C.Md.1955, 128 F.Supp. 457. In Bissell, for example, the court concluded "sales are not made in Maryland by defendant", (140 F.Supp. 165, 172) and apparently viewed Masters' activities as involving no more than "advertising, offering for sale and selling in the District of Columbia". Id. at page 174. Similarly, the Revere court deemed Masters' "mail order business conducted from the District of Columbia". 128 F.Supp. 457, 462. Neither decision rests on detailed factual analysis of defendant's operations within Maryland. Such analysis of the proof of defendant's activities in and contacts with New York is so significant as to make inevitable the conclusion that defendant falls within Feld-Crawford.

In like fashion, the multitude of defendant's New York contacts obviates the necessity for entering the morass of legislative history surrounding rejection of the so-called Cole Amendment to Mc-Guire. Cf., Bissell Carpet Sweeper Co. v. Masters Mail Order Company, D.C., 140 F.Supp. 165, 175–179. The case might be otherwise if the defendant had no connection with New York other than, for example, advertising in Washington or even New York newspapers and mailing merchandise requested in response to those ads.

■ Finally, defendant's dissolution after suit requires consideration of the propriety of awarding the injunctive relief plaintiff seeks. Plaintiff's action was filed in September 1954. On October 18, 1954, however, the parties stipulated, defendant "was dissolved as a Maryland corporation." And since dissolution, their stipulation goes on, "the business of defendant, * * * has been carried on by a corporation bearing the same name but organized under the laws of the District of Columbia." The new corporation, defendant's transferee, uses the same name, assets, and below-fair-trade prices as defendant, and is wholly-owned, except for the qualifying shares, by the same stockholders that owned defendant. In short, only the bailiwicks have changed.

In McComb v. Row River Lumber Co., 9 Cir., 1949, 177 F.2d 129, 130, the appellee argued much the same as does the defendant here. There the District Court denied an injunction and dismissed the complaint. During the pendency of the appeal, the successful party below dissolved and sold its assets to a successor corporation which continued the business. It then moved to dismiss the appeal, urging that having been dissolved it could not possibly continue the alleged conduct sought to be enjoined. Analogizing Walling v. Reuter Co., 1944, 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001, in which case an injunction below had issued, the court stated:

"The situation in the instant case seems to us to present an even

22. Sunbeam Corporation v. Masters, Inc., D.C.S.D.N.Y.1954, 124 F.Supp. 155, 158. See also, Sunbeam Corporation v. McMillan, D.C., D.Md.1953, 110 F.Supp. 836.

23. Sunbeam Corporation v. McMillan, D.C. Md.1953, 110 F.Supp. 836.

stronger case [than Walling v. Reuter] for retaining the appeal and adjudicating the merits, because if we dismiss the appeal appellant cannot fall back on his lower court judgment and possibly enforce it against the successor corporation."

Maryland law expressly permits prosecution of any "pending suit or proceeding" against a dissolved corporation.[24] As in the McComb case, so here, dissolution of the corporate defendant *pendente lite* cannot be used to thwart plaintiff's equitable rights.

Plaintiff complains also of the defendant's activities in New Jersey, West Virginia, Virginia, Pennsylvania, Ohio, Massachusetts, Delaware, Connecticut and Maryland. Proof is lacking, however, that the defendant is making resales in any of the said states.

A decree for an injunction in accordance with this opinion may be submitted.

The foregoing shall constitute Findings of Fact and Conclusions of Law in accordance with Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

---

24. Flack's Ann.Code 1951, Art. 23, § 78.
See also Johnson-Battle Lumber Co. v.

Emanuel Lumber Co., 1925, 33. Ga.App. 517, 126 S.E. 861.