**BISSELL CARPET SWEEPER COMPANY,**

v.

**MASTERS MAIL ORDER COMPANY OF WASHINGTON, D. C., Inc.**

Civ. No. 7384.

United States District Court
D. Maryland.

March 23, 1956.

Gilbert H. Weil, New York City, and J. Cookman Boyd, Jr., Baltimore, Md., for plaintiff.

James Robert Miller, H. R. Miller, Silver Spring, and K. Norman Diamond, Washington, D. C., for defendant.

R. DORSEY WATKINS, District Judge.

Plaintiff, Bissell Carpet Sweeper Company (Bissell), a Michigan corporation, sued Masters Mail Order Company (Masters), a Maryland corporation, defendant, for violation of the Maryland Fair Trade Act, Annotated Code of Maryland, 1951 Edition, Article 83, Sections 102–110, and for violation of "the similar fair trade laws of other States." The complaint contained the requisite allegations for suits based upon diversi-

ty of citizenship, and the customary allegations that plaintiff was engaged in manufacturing, selling and distributing carpet sweepers throughout the United States, bearing plaintiff's trade-marks, name and brand; that plaintiff had expended large sums of money in advertising such trade-marks, name and brands and had established therefor a valuable name, reputation and good will, and that such products are in free, fair and open competition in Maryland and in "all other States" with products of the same general class. The complaint further alleged the execution of written agreements with dealers and distributors in all States having fair trade laws, under which the signers "agreed not to resell [1] certain of the carpet sweepers manufactured by plaintiff bearing its trade-marks, name and brands at prices less than those expressly set forth" in such agreements.

It is then alleged on information and belief that defendant has been "and is continuing wilfully and knowingly to advertise and offer for sale"[2] plaintiff's fair traded products "at prices substantially lower than those established by plaintiff pursuant to" the laws of Maryland and the similar fair trade laws of other States; and that unless enjoined, defendant "will continue to advertise and offer for sale" such commodities at less than fair-trade prices.

An injunction is prayed restraining defendant "from advertising, offering for sale or selling" any of plaintiff's fair-traded commodities "at prices less than those stipulated in plaintiff's fair trade contracts and price lists supplemental thereto in force and effect with retailers in the State of Maryland and all other States having similar statutes."

Defendant's answer directly denied the allegations of certain paragraphs of the complaint, and denied "sufficient knowledge or information to form a belief as to" the remaining paragraphs. The answer also asserted five separate defenses which need not be here summarized or considered.

The defendant filed a motion for summary judgment under Fed.Rules Civ. Proc. rule 56, 28 U.S.C. The motion, in addition to facts and grounds stated in an affidavit filed in support of the motion, set forth the additional grounds for relief (1) that the case is controlled by the decision in Revere Camera Co. v. Masters Mail Order Co. of Washington, D.C., Inc., D.C.D.Md.1955, 128 F.Supp. 457, which would require judgment for the defendant; (2) that state law and the McGuire Act, 15 U.S.C.A. § 45(a) could not be applied to defendant's over-the-counter or mail order transactions, which occur only in the District of Columbia; (3) that to attempt to apply State law or the McGuire Act to the District of Columbia would conflict with the exclusive jurisdiction over the District of Columbia vested in Congress by Article 1, Section 8, of the Constitution of the United States, and that Congress has five times refused to pass fair trade legislation in the District of Columbia; and (4) that defendant has been dissolved since the filing of the complaint and has been succeeded by a District of Columbia corporation.

The affidavit in support of the motion averred that defendant has only one business establishment, which is located

---

1. The agreement filed as an Exhibit with the complaint is a "Direct Retailer's Purchasing Agreement" and the prices are set forth in a "Direct Retailer's Price List."

A "direct retailer" agrees that:

"We will not sell sweepers bearing your name or trade-mark at less than your Fair Trade minimum retail prices at the time of such sales. (See other side for present price list). (This paragraph does not apply any place where price agreements are not permitted by law)."

It will be noted that the undertaking of the "direct retailer" does not, as is usually the case, contain an express prohibition against "advertising" or "offering for sale" at less than the fair-trade minimum.

2. Note that the complaint does not allege *sales* by defendant at less than fair-trade prices, *anywhere*. As will be later seen, this omission is advertent.

in the District of Columbia, in which a stock of merchandise is maintained which is offered for sale both over-the-counter and by mail, more than two-thirds of the sales being over-the-counter; that all sales by mail have been made pursuant to orders received directly from purchasers at the Washington, D. C. place of business; and that all mail orders have been filled by direct shipments, in factory cartons, originating from the District of Columbia, either by mail or by other carriers.

The affidavit also alleged on information and belief that "such products have been exclusively purchased by consumers for their own use and have not been held for resale in Maryland or any other fair trade jurisdiction" and "no mail order customer or any other customer of the Company has ever purchased any goods from it for resale."

The affidavit further averred that the only salesmen employed by the defendant are those who serve behind the counter in its store in the District of Columbia, and that defendant "has not advertised or offered plaintiff's products for sale except by mail from, or over the counter in, its place of business in the District of Columbia." The affidavit concluded with the allegation that as of October 18, 1954 the defendant was dissolved and the defendant's business has since been carried on by a corporation bearing the same name but organized under the "modern corporation law" of the District of Columbia.

No opposing affidavit was filed. At the hearing on the motion, counsel for plaintiff conceded, for purposes of the motion, the facts averred in the affidavit in support of the motion. Both sides agreed "that there is no genuine issue as to any material fact", (F.R.C.P. 56(c)), and that the pleadings had been intentionally framed to present the question of law as to whether or not advertising originating in the District of Columbia, a non-fair-trade jurisdiction, directed to resi-dents of Maryland and other fair trade States, either by newspaper advertising or direct mail advertising, but "offering" the goods "for sale" only in the District of Columbia,[3] is a violation of the Maryland Fair Trade Act; and if so, whether the application of the Maryland Act to such advertising is authorized by the McGuire Act (15 U.S.C.A. § 45(a) (1–5)).

### Statutes Involved.

The purpose of the Maryland Fair Trade Act, as enacted by Laws of 1937, ch. 239, was stated to be:

"* * * to protect trade-mark owners, producers, distributors and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade-mark, brand or name, through the use of voluntary contracts establishing minimum resale prices and providing for refusal to sell unless such minimum resale prices are observed."

The applicable portions of the Maryland Fair Trade Act, Annotated Code of Maryland, 1951 Edition, Article 83, are Sections 102(D), 103 and 107, reading as follows:

Sec. 102(D) " 'Retailer' means any person selling a commodity to consumers for use."

Sec. 103. "No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, or the vending equipment from which a commodity is sold to consumer bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Maryland by reason of any of the following provisions

3. That is, the advertising advises the reader that the goods in question can be pur-chased from defendant's District of Columbia store.

which may be contained in such contract:

"(A) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.

"(B) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

"(C) That the seller will not sell such commodity.:

"(1) to any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"(2) to any retailer, unless the retailer will agree not to resell the same except to consumers for use at not less than the stipulated minimum price."

Sec. 107. "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of Sections 102–110, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The stated purpose of the McGuire Act, amending section 45(a) of 15 U.S. C.A. is:

" 'That it is the purpose of this Act (amending this section) to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce.' " Section 1, 15 U.S.C.A. § 45 note.

As so amended, 15 U.S.C.A. § 45(a) (1–5) reads as follows:

"§ 45. Unfair methods of competition unlawful; prevention by Commission.

"(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

"(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

"(3) Nothing contained in this section or in any of the Antitrust

Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

"(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right or right of action as described in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce.

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other."

Revere v. Masters.

There is real substance in defendant's contention that the question here involved was decided by Judge Chesnut in his opinion in Revere Camera Co. v. Masters Mail Order Co. of Washington, D. C., Inc., D.C.D.Md.1955, 128 F.Supp. 457. The first part of the opinion is devoted to a discussion of the impact of the McGuire Act, 15 U.S.C.A. § 45(a), upon the sale and delivery of merchandise from the District of Columbia into Maryland. However, the court then discussed, and expressed its views upon, the application of the McGuire Act and Section 107 of Article 83 of the Maryland Code of Public General Laws, as follows, 128 F.Supp. at pages 461–462:

"The contention of the defendant here in support of the motion to dismiss the complaint is that, by the language of the McGuire Act, Congress did not intend it to apply to sales made by a vendor in one State or Territory having no fair trade law with shipments of goods into another jurisdiction; and further that to find such an intention in the McGuire Act would be contrary to the constitutional principles of freedom of interstate commerce. To the contrary the plaintiff here contends that the McGuire Act was intended to subject goods shipped from a non fair trade jurisdiction into a fair trade State to the laws of the State into which they were shipped. And more particularly it is contended by the plaintiff that offers by mail, advertisement or circular by a vendor in a non fair trade jurisdiction to sell goods at cut prices in a fair trade State is contrary to the effect of the McGuire Act; and more particularly is a violation of section 107 of Article 83 of the Maryland Act which provides:

" 'Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of Sections 102–110, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.'

"In the MacMillan case [Sunbeam Corp. v. MacMillan, D.C.D.Md. 1953, 110 F.Supp. 836] the Maryland fair trade law in general and its validity and enforcement in several cases in the Maryland Court of

Appeals was considered and reviewed. There was no occasion in that case to consider the applicability of section 107 to the factual situation presented in the instant case with respect to the sale of goods from Washington into Maryland. And I know of no Maryland judicial decision which deals with such a situation. In the absence of any expression by the Maryland Court of Appeals upon the subject, it at least would be a very doubtful conclusion that section 107 should be here applied to the instant situation as contended for by the plaintiff. Nor is it clear to me that the language of the McGuire Act does fairly support the plaintiff's contention in this respect.

"The plaintiff seeks to apply the language of section 107 of the Maryland Act which forbids willfully and knowingly advertising, offering for sale or selling at cut prices, to the defendant's mail order business conducted from the District of Columbia into Maryland and other fair trade States. While the averments of the complaint do in very general language allege a violation of the Maryland law, I have failed to note any specific averment that defendant's goods sold into Maryland have been there held for re-sale either in Maryland or to other jurisdictions. In my view the prohibition of section 107 of the Maryland Act has, by virtue of the necessary nature of the subject matter, relation only to advertising or offering for sale or selling commodities which are to be *re-sold* after they have come into the State, whether re-sold in the State or out of the State. The validity of the whole of the Maryland Act is necessarily dependent upon the Miller-Tydings Act of 1937 [15 U.S.C.A. § 1] as fortified and amplified by the McGuire Act of 1952; and it will be noted that the title of the McGuire Act is to amend the Federal Trade Commission Act with respect to *re-sale* prices when in accordance with the law of a particular State; and para. 2 of the McGuire Act states the exemption of fair trade agreements in terms of limitation as to the re-sale prices under particular State laws. In my opinion at this stage of the case and as now presented on the papers submitted on the motion before the court, the McGuire Act does not of itself relate to the subject matter of the sale of goods from a non fair trade jurisdiction into another jurisdiction either with or without sales consummated by mail order advertising from one jurisdiction to the other. Historically considered, the impact of the Miller-Tydings Act and the McGuire Act on the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note] had the effect of removing from the operation of the Sherman Act re-sale price maintenance agreements when authorized by the law of a particular State. Or, in other words, Congress restored to the several States their power to regulate commerce within the State exempt from the prohibition of the Sherman Act, and Congress also exempted from the Sherman Act interstate commerce with respect to transactions either permitted or prohibited by the laws of the fair trade States respectively. The result is that the Sherman Act does not apply to interstate commerce as to shipments into or out of fair trade States in the carrying out of fair trade agreements. It is the law of the particular State which is to control in those situations." (Court's italics.)

The Court then reviewed the Cole amendment which would have specifically covered and excluded mail order sales from non-fair-trade States into States having fair-trade laws; the position of the Department of Justice [4] that the Mc-

---

4. Sunbeam Corp. v. Missouri Petroleum Products Co., Inc., Civil Action No. 9887, E.D.Missouri.

Guire Act did not prohibit advertising in fair-trade States of sales at cut prices in a non-fair-trade State; the possible contrary construction of legislative history (128 F.Supp. at page 463); and then expressed the *conclusion* that "if the only issue tendered by the averments of the complaint were the effect of the McGuire Act", a dismissal would be in order (128 F.Supp. at page 464). As, however, various factual issues were also raised, the motion to dismiss was overruled without prejudice.

Plaintiff contends that Section 107 of Article 83 of the Maryland Code covers three separate and different offenses; (a) advertising; (b) offering for sale; or (c) selling[5] at less than fair-trade prices. Plaintiff also contends that advertising may be more disruptive of resale price maintenance than actual sales.[6] Both of these contentions were pressed in argument[7] in the Masters case, so that Judge Chesnut's holding that Section 107 of Article 83 has "relation only to advertising or offering for sale or selling commodities which are to be *re-sold* after they have come into the State," far from being dictum,[8] was essential to the decision of the case.

Moreover, in plaintiff's memorandum in Opposition to Motion to Transfer in the Masters case, counsel stated:

"Thus the act of advertising, independently of any consummated sales, is all that the plaintiff need show to establish a cause of action. The law obviously recognizes the deleterious consequences of such advertising, which presumably would not be done unless the advertiser contemplated eventual sales."

Counsel for plaintiff herein participated in the argument in the Masters case.

This Court could therefore properly grant defendant's motion to dismiss on the basis of the opinion in Revere Camera Co. v. Masters Mail Order Co. of Washington, D. C., Inc., D.C.D.Md.1955, 128 F.Supp. 457. If the Maryland Act relates only to advertising, offering for sale or selling commodities which are to be re-sold after they come into Maryland, a fortiori it would appear inapplicable merely to advertising or offers disassociated from sales. Nevertheless, plaintiff has requested, and the pleadings require, a decision on this limited question under the Maryland Fair Trade Act.

Several approaches suggest themselves.

### Technical Aspects of Plaintiff's Agreements.

1. Plaintiff's Maryland retail price maintenance agreement is designated a "Direct Retailer's Purchasing Agreement." Under it plaintiff agrees to recognize the signer as a "direct retailer" and to extend to the signer plaintiff's "unit prices to direct retailers." The signer agrees to place orders in minimum quantities of 36 regular sweepers for shipment at one time: "TERMS will be 2% 10 days, net 30 days, EOM. SHIPMENTS will be FOB Grand Rapids, Michigan. Title shall pass upon delivery of goods to carrier and thereafter risk of loss shall be upon" the signer.

Presumably a "direct dealer" is one who deals "directly" with the plaintiff. There is no allegation in the complaint that defendant is a "direct dealer", or as to what may be defendant's trade classification other than that of a vendor. The

---

5. In its discussion in this case of the Masters decision, plaintiff, as did the Court in the decision therein, refers to resales. Elsewhere in its brief and argument, plaintiff refers to "sales".

6. It is at least doubtful that plaintiff "has expended large sums of money in advertising", as alleged in the complaint, on any theory other than that advertising would produce sales.

7. In the course of oral argument in the Masters case, counsel attacked, not less than fifteen times, Masters' practice of advertising and selling; and the subject of advertising was separately mentioned on not less than twenty other occasions.

8. As contended in oral argument on the motion in this case. Contra, see Note: 54 Mich.L.Rev. 431 (1956).

"price stipulated" (Art. 83, Sec. 107) in plaintiff's Maryland agreement relates to a certain class of dealer only; one who buys directly from plaintiff, in certain minimum quantities, and on certain terms as to freight and passage of title. Such agreement is not similar to the usual ones [9] which purport to cover all "retailers" regardless of their source of supply or amount of purchase or sales.

■ Since the Maryland agreement was prepared by plaintiff, and is limited in its application, the complaint to state a cause of action must allege that defendant was engaged in a transaction covered by such resale agreement. This it fails to do.

■ 2. Plaintiff's Maryland retail price maintenance agreement, again in contrast with the customary form[10], does not contain an express undertaking against advertising or offering for sale at less than the price stipulated in such agreement. Plaintiff contends that it is unnecessary expressly to contract with respect to such matters, since they are automatically covered by Section 107 of Article 83; that is, if there is an agreement with respect to resale price maintenance, the law itself makes advertising or offering to sell below such price "un-fair competition." Whether the doctrine of expressio unius, or voluntary waiver by the omission of provisions customarily found in such agreements, could be invoked is not sufficiently clear to justify summary judgment.[11]

### Applicability of the Maryland Act.

■ Defendant has not signed a price maintenance agreement with plaintiff. Indeed, as the District of Columbia has no fair trade statute, an agreement between plaintiff and defendant as to retail price maintenance within the District of Columbia would be illegal. For the purpose of the decision herein, sales are not made in Maryland by defendant.[12]

There is no contention that defendant advertises in Maryland that it will make sales of commodities (either for consumption or resale) in Maryland at less than the prices fixed in Maryland fair-trade agreements; nor that it offers to sell in Maryland (either for consumption or resale) commodities at less than the prices fixed in Maryland fair-trade agreements. Accordingly, "offering for sale", for the purpose of this case, would seem to be equivalent to "advertising that prospective buyers may submit offers for acceptance." [13]

9. E.g., the agreements filed as exhibits in Revere Camera Co. v. Masters Mail Order Co. of Washington, D. C., Inc., D.C.Md., 128 F.Supp. 457; Eastman Kodak Co. v. Home Utilities Co., Inc., D.C.Md., 138 F.Supp. 670.

10. See Note 9.

11. The possible defects in the form of plaintiff's Direct Retailer's Purchasing Agreement could of course be met by appropriate amendments, and while a possible ground for disposition of this motion, would not be dispositive of the more important legal question.

12. More than two-thirds of defendant's sales are made over-the-counter at its store in the District of Columbia. It would appear to be in the nature of a concessum that such sales could not be reached by the Maryland Fair Trade Act. General Electric Co. v. Masters Mail Order Co. of Washington, D. C., Inc., D.C.S.D.N.Y.1954, 122 F.Supp. 797, 799, footnote 2. Sales by mail are made from the District of Columbia store pursuant to orders received directly from purchasers at defendant's Washington, D. C., place of business, and are filled by direct shipments, in factory cartons, originating from the District of Columbia, either by mail or other carrier. Passage of title is dependent upon the intention of the parties. Agri Mfg. Co. v. Atlantic Fertilizer Co., 1916, 129 Md. 42, 48, 98 A. 365.

13. See, 1 Corbin, Contracts, Sec. 88, p. 275 (1950):
"When one party solicits and receives an order or other expression of agreement from another, clearly specifying that there is to be no contract until ratification or assent by some officer or representative of the solicitor, the solicitation is not itself an offer; it is a request for an offer."
Ibid., Sec. 24, that advertising may be a request for an offer.
See, also, Enforcement of Fair-Trade Laws in Non-Fair-Trade Jurisdictions, 22

Now to advertise is "to give notice to; to inform; to make known to".[14] It appears that this is nothing more than "to tell". Therefore, reduced as nearly as possible to words of one syllable,[15] plaintiff contends that Maryland forbids any one to be told, within the territorial limits of the State, the following truthful facts: "In the District of Columbia an agreement between maker or distributor of a commodity and the seller thereof, fixing the price at which a commodity may be sold in the District of Columbia, would be unlawful. In Maryland such price-fixing agreements are legal. The price fixed by such Maryland agreements is higher than the price at which we sell like goods in the District of Columbia. If you come to our store in the District of Columbia, or if you order by mail from our District of Columbia store, enclosing the price, and if your order is accepted, you will be shipped such goods at our over-the-counter price. You cannot buy these goods from us in Maryland."

Does the Maryland law purport to make it actionably unfair competition for its citizens to be told such facts?[16]

■ The Maryland Fair Trade Act is in derogation of the common law, and to be strictly construed. Venable v. J. Engel & Co. Inc., 1947, 193 Md. 544, 549, 69 A.2d 493, 495:

"* * * The Fair Trade Act is in derogation of the general rule of the common law that any person has the right to sell his property at any price that he and the purchaser may agree upon, and the courts should accordingly construe the Act strictly [17] and should not infer that the Legislature intended to change any common-law principle beyond what the Act explicitly provides. * * *"

The Maryland Fair Trade Act was an enactment of the Maryland Legislature providing that a contract relating to the sale or resale of a commodity (under specified conditions precedent) should not be "deemed in violation of any law of the State of Maryland by reason" of minimum resale price provisions. It is wilfully and knowingly "advertising * * * for sale [18] or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of Sections 102–110" of Article 83 of the Maryland Code of Public General Laws that "is unfair competition and is actionable at the suit of any person damaged thereby."

U. of Chicago L.Rev. 525, 526–7 (1955); The McGuire Act and Discount House Sales into Fair-Trade States, 43 Georgetown L.J. 258, 268 n. 45 (1955); The McGuire Act and the Mail Order Vendor —Commerce Clause Limitations on Anti-Fair Trade State Policies, 30 Indiana L. J. 502, 508–509 (1955).

14. Webster's New International Dictionary, Unabridged, 2d Edition.

15. A practical illustration of the difficulty of achieving this end, since "syllable" is itself a word of three syllables.

16. Is it unfair competition to tell potential employees of Maryland industry that wages for similar jobs with the United States Government in the District of Columbia are higher? Does the claimed legislative mandate of compulsory ignorance make it unlawful truthfully to tell a Maryland resident that the legal rate of interest on small loans is lower; the statute of limitations on promissory notes is shorter; the exemption from attachment is greater; the water is purer; the girls are slimmer; and the period of (bona fide) residence for divorce is shorter, in some other state—or foreign country—than in Maryland? Within the rationale of the Act—"to protect * * * the general public against injurious and uneconomic practices"—what is the limit on "protection" of the public against its own concept of its own economic interests?

17. What is the converse of "strict"? Is it "loose" or is it "liberal"? Presumably a court would insist, whatever characterization was applied, that the result of such application should be "fair and reasonable". See McKenzie v. Peoples Baking Co., 1944, 205 S.C. 149, 31 S.E.2d 154.

18. It could scarcely be contended that advertising as such, in the abstract, without an indication that the commodity could be bought, would be covered.

A "fair and reasonable" [19] construction would seem to be that the Maryland law was intended to apply but to apply only, to advertising in Maryland that commodities covered by a fair-trade contract with a Maryland vendor ("entered into pursuant to the provisions of Sections 102–110" of Article 83) could be purchased in Maryland at less than the price fixed under such Maryland contract. The converse would be that the Maryland Act purported to cover a case where the only contract was entered into in New York, the only advertising was in Wisconsin, and the advertisement offered the commodity for sale only in California; or, the only contract was entered into in New York, the only advertising was in Cairo, Egypt (in the native tongue) and the advertisement offered the commodity for sale only in Gussage Cow Down, Dorsetshire.[20]

The reductio ad absurdum of the reading of an extra-territorial application into the Maryland law would appear to be illustrated by at least the following potential results:

(1) The coverage of transactions, none of which occurs in Maryland, suggested in the immediately preceding paragraph.

(2) The dilemma as to which price Maryland would enforce, if the producer or distributor has by contracts established different fair trade prices in different localities [21] or in the same locality. If in fact the "commodity is in free and open competition with commodities of the same general class produced or distributed by others" (Art. 83, Sec. 103), variations in price might be expected. Indeed, plaintiff has at least two different fair trade prices on its fair-traded carpet sweepers. On the "Direct Retailer's Purchasing Agreement" filed as an exhibit with the complaint herein is a "Direct Retailer's Price List". This lists the "Fair Trade Minimum Retail Price" of a number of items, with the note "Fair Trade minimum retail prices slightly higher in Western States, Details on request."

(3) If the Maryland Act did and could cover advertising, offering for sale and selling in the District of Columbia, and if defendant could be enjoined [22] from advertising, offering for sale, or selling in the District of Columbia except in accordance with prices fixed in contracts with Maryland (or any other fair-trade state) retailers, defendant under penalty of contempt would be required to conduct its business under compulsion, and by virtue of contracts to which it is not and could not legally be a party, in a manner it could not voluntarily and directly contract to do. Plaintiff itself would seem to admit this cannot be done, as the retail price maintenance paragraph in its "Direct Retailer's Purchasing Agreement" expressly provides that "This paragraph does not apply any place where price agreements are not permitted by law."

The Court therefore concludes that the Maryland Fair Trade Act does not apply to defendant's advertising under the case made by the complaint, motion for summary judgment, and supporting affidavit. However, even if the Maryland Act did undertake to cover such advertising, its validity is dependent upon the finding of an authorization therefor in the McGuire Act.

19. See note 17, supra.

20. The Maryland Act nowhere says in so many words that its application is limited to events occurring, or to occur, in Maryland only. Certainly, however, if Maryland intended to give extraterritorial effect to its laws it would be expected that, apart from any question of power, such unusual intent would be clearly disclosed. It is therefore submitted that if the attempt is made to read an extra-territorial application to either advertising, or offering for sale, or selling, it could with equal justification, or lack thereof, be read as to any two, or all three thereof.

21. Fair Trade and the McGuire Act, 16 U. of Pitt.L.Rev. 50, 59–60 (1954).

22. At the time the complaint was filed, defendant was a Maryland corporation.

## The McGuire Act.

Here again the temptation is strong to rest decision upon the analysis of the legislative history of the McGuire Act given in Revere Camera Co. v. Masters Mail Order Co., of Washington, D. C., Inc., D.C.D.Md.1955, 128 F.Supp. 457, 461–462, and the conclusion therein that that Act "does not of itself relate to the subject matter of the sale of goods from a non fair trade jurisdiction into another jurisdiction either with or without sales consummated by mail order advertising from one jurisdiction to the other." The wish is not weakened by the fact that support for diametrically opposite views can be drawn from the legislative history of the Act.[23] However, some supplementation may be justified.

The McGuire Act was characterized by its namesake as "an enabling measure"[24] and it was similarly denominated in its course through the Congress by Congressman Patman[25], Congressman

23. An excellent review of the legislative history is detailed in The McGuire Act and Discount House Sales into Fair-Trade States, 43 Geo.L.J. 258 (1955). The author states (p. 264):

"Congressional intent appears more clearly and certainly in the legislative history of the McGuire Act than in the history of the passage of most other Acts. It is abundantly clear that the McGuire Act was not intended to cover an interstate transaction between a free-trade and a fair-trade state."

In a very thorough note, The McGuire Act and the Mail Order Vendor—Commerce Clause Limitations on Anti-Fair Trade State Policies, 30 Indiana L.J. 502 (1955), the opposite conclusion is reached, although the author admits (p. 520), that

"A scintilla of doubt may be raised by the fact that the McGuire Act, its preamble, the committee reports, and the congressional debates all are set in terms providing for state freedom of choice in resale price maintenance policy."

See also, Fair Trade and the McGuire Act, 16 U. of Pitt.L.Rev. 50 (1954); The Continuing Fair Trade Battle, 29 St. John's L.Rev. 66 (1954); Enforcement of Fair-Trade Laws in Non-Fair-Trade Jurisdictions, 22 U. of Chi.L.Rev. 525 (1955); Regulation of Business—Fair Trade Laws—Application of the McGuire Act to Mail Order Sales Emanating in a Non-Fair Trade Jurisdiction, 54 Mich.L. Rev. 431 (1956) and The McGuire Act and the Mail Order Vendor—Commerce Clause Limitations on Anti-Fair Trade State Policies, 30 Indiana L.J. 502 (1956) stating (at p. 504):

"In the McGuire Act of 1952, Congress attempted once again to establish effective fair trade for those states desiring it, while at the same time preserving for other states freedom to choose free trade. In stipulating that neither the making of fair trade contracts nor the enforcement of rights of action under fair trade laws is an 'unlawful burden or restraint upon, or interference with commerce,' the legislative body did not, however, specifically mention that the sales of non-signing, mail order vendors located in the non-fair trade jurisdictions could be enjoined."

24. "* * * The bill is merely an enabling measure * * * It is not coercive. The States are not forced to do anything * * *

"If a State does not believe in price maintenance, it is not forced to tolerate the practice. In the absence of state legislation authorizing price maintenance, the Federal law remains unchanged. No State need fear any encroachment on its internal affairs by neighboring States pursuing a different policy." 97 Cong.Rec. 13404 (1951).

25. Congressman Patman, Hearings on H. R. 5767, Subcommittee on the Committee on Interstate and Foreign Commerce, House of Representatives, 82d Cong., 2d Sess. p. 7:

"The way I construe this bill is that it is an enabling act, enabling States to do business across State lines where the state laws are similar. In other words, if Maryland and Pennsylvania have similar laws concerning fair trade, this bill permits business to extend across the State line and the contracts made in compliance with the laws of these two States to be enforced in interstate commerce.

"It occurs to me it is a very simple question. I do not see why anyone should oppose the Congress permitting two States to do business across the State line where they have similar laws unless, of course, it is something immoral or on questions like that which should be raised, which is not raised in this particular issue."

This was again stated by him (98 Cong. Rec. 4939 (1952)):

"It merely says what the Constitution says is the duty of Congress to regulate commerce among the States, and if two

Rogers [26], Congressman Wolverton [27], Congressman Harris [28] and Congressman Beamer[29].

Also pending was the Keogh Bill [30], which would have created a Federal cause of action for "unfair competition", but would expressly have excluded from its provisions "advertisements for sale, offers for sale, or sales which originate from or are directed to or are completed within any State, Territory, or the District of Columbia, where such contracts or agreements as are described herein are not lawful by statute * * *"

Whether the defeat of the Keogh bill was because of the creation of a Federal cause of action; because it specifically exempted transactions originating in free trade jurisdictions; or because it pleased neither free trade, fair trade, nor states' rights advocates, is a matter for argument rather than demonstration.[31]

That there was at least a very strong doubt that the McGuire Act applied to transactions between fair-trade and free-trade jurisdictions is strongly evidenced by the so-called Cole amendment offered by Congressman Cole to the McGuire Act, designed to prevent "raids on the part of mail order houses and cut rate retailers and wholesalers in non-fair-trade states." [32] So far as pertinent, the proposed amendment read:[33]

"Whenever by contract or agreement described in subsection (2) a stipulated or minimum resale price may be established for a commodity in any State, Territory, or the District of Columbia, where such a contract or agreement is lawful, it shall be an act of unfair competition, actionable at the suit of any person damaged thereby, to wilfully and knowingly, in interstate commerce (1) *sell or (2) have transported for sale or resale or (3) deliver pursuant to a sale, or otherwise deliver,* such commodity in any such State, Territory, or the District of Columbia, where such a contract or agreement is lawful, at less than the price or prices so established in such contract or agreement". (Emphasis supplied.)

The Cole amendment was vigorously opposed by Congressman Patman, in the

States have similar laws it is the duty of Congress to allow the people in those two states to cross State lines with their transactions in interstate commerce where it is legal in the two States. That is exactly what we are doing here, except 45 States are involved instead of two States * * * So this is just an enabling act, just to enable those 45 States to do business across State lines."

26. "Mr. Chairman, this a very important Bill. I wish every one of you had had the time to read the hearings. This is a simple bill, and it merely does this: It is the enabling act, which enables the State to do business across State lines. Remember that. In its simplicity, it just permits a State to do business with an adjoining State, if they have similar laws. In other words, if New York and Pennsylvania have similar laws concerning fair trade, this bill permits business to extend across the State line and permits the contracts made in compliance with the laws of those two States to be enforced in interstate commerce. That is all it does." 8 Cong.Rec. 4906 (1952).

27. "* * * recognition of these [fair trade] State laws in interstate transactions between each other." 98 Cong. Rec. 4905.

28. 98 Cong.Rec. 4916 (1952).

29. "All the proponents of H.R. 5767 propose is to enable the fair-trade laws of these 45 States to function in interstate commerce according to the expressed policies of the respective States, and to accomplish only that, without in any way affecting or interfering with any sales of any products within any State not having a fair-trade act. At the present time, Missouri, Texas, Vermont, and the District of Columbia." 98 Cong.Rec. 4917 (1952).
[Since the above quoted statements, successful attacks have been made upon the fair-trade laws of Florida, Georgia, Michigan, Nebraska, Arkansas and Utah].

30. H.R. 6925; 98 Cong.Rec. 4934 (1952).

31. See 43 Georgetown L.J., at p. 266; 54 Mich.L.Rev. 431.

32. 98 Cong.Rec. 4952 (1952).

33. Ibid.

following language (98 Cong.Rec. 4953 (1952)):

"Mr. Chairman, I rise in opposition to the amendment offered by the gentleman from Kansas [Mr. Cole].

"Mr. Chairman, in practice let us see what this amendment will do. It applies to the non-fair-trade States in particular—Texas, Missouri, Vermont, and the District of Columbia. It means in the case of a merchant in Texarkana, Tex., who advertises a certain product for sale and delivers anywhere in that territory, if some of his orders should come by telephone, mail, or otherwise from the State of Arkansas, where they have a fair-trade law, the merchant would have to stop his shipment at the State line. He could not go over into Arkansas at all. In other words, he would be prevented from selling to his Arkansas customers at the same price he sells to his Texas customers. That same example could be used for Kansas City, Mo., and Kansas City, Kans. It could be used in the case of other States and State lines.

\* \* \* \* \* \*

"The fact is that Texas does not have it, Missouri does not have it, Vermont does not have it, and the District of Columbia does not have it, because Congress has never legislated a fair-trade law for the District of Columbia. This is an attempt to compel fair-trade prices in States that have never adopted the law at all. It is entirely contrary to the concept we have in advocating the McGuire bill. In advocating the McGuire bill we say it is a States' right bill. We just permit the States to carry out the contracts that the States have said that they want carried out, and because there is a State line between them, why we will permit it in interstate commerce under the McGuire bill. But here you are placing a burden upon the merchants in those States where they have no fair-trade law. You restrict his efficiency, you restrict the value of his advertising. You take in cities like Kansas City, half of the benefit of advertising goes over into Kansas, and vice versa. But here you could not deliver the goods in one of these States; you would be absolutely stopped at the State line. It would be a violation of the law to deliver the goods."

In view of the controversial aspect of paragraph (4)[34] of the McGuire Act, the rejection of the Cole amendment, in view of the clear recognition of its meaning and purpose, is highly significant.

The House rejected amendments and substitutions, and passed the McGuire Act on May 8, 1952.[35] On May 9, 1952, it was sent to the Senate, and was referred to the Senate Committee on Interstate and Foreign Commerce in the form in which it was subsequently enacted into law. Senators Hunt [36] and Humphrey [37] indicated their opinions to be that mail order houses would have to comply with the fair-trade laws of the various states. This view was certainly not unanimously shared. At Committee Hearings on H.R. 5767, the President of the American Fair Trade Council advocated the adoption of a "home-town amendment", identical with the Cole amendment, on the grounds that paragraph (4) was vitally defective, and did not with any certainty cover the exposures to raids by mail order houses.[37] Similar demands for such an amendment were made by representatives of the National Federation of Independent Business [38], American National Retail Jewel-

34. Cf. H.R.Rep.No. 1437, 82d Cong., 2d Sess. 2 (1952) with footnote 4, supra.

35. 98 Cong.Rec. 4956 (1952).

36. 98 Cong.Rec. 8885 (1952).

37. Hearings before Committee on Interstate and Foreign Commerce on H.R. 5767, 82d Cong., 2d Sess. 85, 86, 89, 107, 316.

38. Id. at 256.

ers Association [39] and the National Retail Furniture Association.[40] On the other hand, the representative of the National Association of Retail Druggists considered paragraph (4) to be adequate.[41]

The Committee reported out the McGuire Bill without amendment or recommendation, and it was passed by the Senate in the form received from the House.

Of some possible significance in interpreting the application of the McGuire Act is the fact that Congress has repeatedly refused to pass a fair-trade law for the District of Columbia, despite the arguments that mail order houses were using the District of Columbia as a haven of refuge from which to invade the fair-trade states.

Although to this Court the legislative history seems to support the view that the McGuire Act does not purport to apply to transactions such as are involved in the instant case, that history does afford some support for the contrary conclusion. Since the meaning of this legislative history is "doubtful", it may be well to apply the canon of construction of Mr. Justice Frankfurter's wag, and "go to the statute." [42]

Paragraph (4) of Section 45(a), Title 15 U.S.C.A., provides that:

"Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right or right of action as described in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce."

Paragraph (3) exempts from the antitrust laws the exercise or enforcement of any right or right of action "created by any statute, law, or public policy now or hereafter in effect in any State * * * which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices *prescribed in such contracts or agreements*" whether on the part of a signer or nonsigner, is unfair competition and actionable. (Emphasis supplied.)

"Such contracts or agreements" are those mentioned in paragraph (2), which exempts from the anti-trust laws, contracts or agreements prescribing "minimum or stipulated prices, *for the resale of a commodity*" trademarked or branded, and in free and open competition with similar commodities produced or distributed by others, "when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter *in effect in any State,* Territory, or the District of Columbia *in which such resale is to be made, or to which the commodity is to be transported for such resale.*"[43] (Emphasis supplied.)

The stated purpose of the McGuire Act, amending Section 45(a) of 15 U.S. C.A., was "'to protect the rights of States under the United States Constitution to regulate their internal affairs and * * * to enact statutes and laws, and to adopt policies, which authorize contracts and agreements'" prescribing minimum prices, and binding upon nonsigners. It would appear to this Court, with or apart from a consideration of such stated purpose, that the McGuire Act intended only to permit any State that so desired to authorize the making of contracts fixing minimum re-

39. Id. at 264.

40. Id. at 274.

41. Id. at 421.

42. Greenwood v. United States, 1956, 350 U.S. 366, 374, 765 S.Ct. 410, 415.

43. Note the emphasis upon, and limitation to, "resale", both in paragraph (2). and in the stated purpose of the amendatory Act—"'prices for the resale of commodities'"—stressed in the Masters case, 128 F.Supp. 457, 462. Note also that Maryland has attempted in other connections to reach *deliveries*, as in the Use Tax, Maryland Code of Public General Laws, Art. 81, sec. 373; Miller Bros. v. State of Maryland, 1954, 347 U. S. 340, 74 S.Ct. 535, 98 L.Ed. 744.

sale prices with respect to goods resold in that State, or transported into such State for resale.[44] Certainly any construction that would purport to authorize contracts relating to "resales" in Maryland to apply to sales in another State, would far transcend the "internal affairs" of Maryland, and directly impinge upon the "internal affairs" of some other State, Territory, or the District of Columbia. Such a construction would mean that the price fixed by a contract between a producer and a single retailer in Maryland would not only bind all non-signers in Maryland, but all retailers throughout the United States. This would include retailers in free-trade states and the District of Columbia. It would also purport to establish a uniform nation-wide minimum price, regardless of prices voluntarily attempted to be fixed by the producer and other retailers, whether as the result of "free and open competition", or superior bargaining.

This Court accordingly holds that the McGuire Act removes from the application of the anti-trust laws, so far as the Maryland Fair Trade Act is concerned, only contracts and agreements prescribing minimum prices on "resales" (or sales) in Maryland, and advertising and offers with respect thereto. As in the instant case, sales are made from the District of Columbia, not in Maryland, and as the advertising and offers relate only to such District of Columbia trans-

actions, this Court is of the opinion that an effort to apply the Maryland law thereto would not be authorized by the McGuire Act.

The Court has considered, but found to be factually different, authorities cited by plaintiff as bearing upon the question of statutory construction; e. g. General Electric Co. v. Masters Mail Order Co. of Washington, D. C., Inc., D.C. S.D.N.Y.1954, 122 F.Supp. 797; Sunbeam Corp. v. Masters, Inc., D.C.S.D.N. Y.1954, 124 F.Supp. 155; Sunbeam Corp. v. Payless Drug Stores, D.C.N.D. Cal.1953, 113 F.Supp. 31; Schwegmann Bros. Giant Super Market v. Eli Lilly & Co., 5 Cir., 1953, 205 F.2d 788, certiorari denied 1953, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369; General Electric Co. v. Masters, Inc., 1954, 282 App.Div. 1024, 126 N.Y.S.2d 887; 307 N.Y. 229, 120 N. E.2d 802; Lionel Corporation v. S. Klein-on-the-Square, 1954, 282 App.Div. 856, 124 N.Y.S.2d 715; 307 N.Y. 229, 120 N.E.2d 802; Raxor Corp. v. Goody, Sup.1954, 121 N.Y.S.2d 882; 282 App. Div. 921, 125 N.Y.S.2d 643; 307 N.Y. 229, 120 N.E.2d 802, appeal dismissed, 1954, 348 U.S. 863, 75 S.Ct. 88, 99 L.Ed. 701; Tagle Co. v. Rival Drug Co. Inc., 1940, 104 N.Y.L.J. 91, col. 6; Eastman Kodak Co. v. Seigal, Sup.1955, 140 N.Y. S.2d 250; and General Electric Co. v. Packard Bamberger & Co., 1953, 14 N.J. 209, 102 A.2d 18.

For the various reasons above set forth,[45] including the opinion in the Mas-

---

44. Since the typical signer is a retailer, his sale, from the viewpoint of a producer or distributor, may be referred to as a "resale".

45. As, in addition to the authority of the Masters case, this decision turns primarily upon the conclusion that neither the Maryland Fair Trade Act nor the McGuire Act purports to cover the instant case, it is unnecessary to discuss in any detail the further arguments of plaintiff, although all of them were considered. One most strongly urged was that the "impact" of an act initiated in state A may give rise to legal consequences and legal liability in state B; Young v. Masci, 1932, 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158; Restatement, Conflict of

Laws, Sec. 65; Hunter v. Derby Foods, Inc., 2 Cir., 1940, 110 F.2d 970, 133 A.L.R. 255; and Howser v. Pearson, D.C.D.C.1951, 95 F.Supp. 936. Granted the premise, the principle is applicable only if that which takes effect in state B is a "wrong" committed in that state. Here the finding of the court is that advertising in Maryland that goods may be purchased from the District of Columbia is not a violation of Maryland law. Likewise, it is unnecessary to consider any implications that plaintiff urges should be drawn from the Prohibition Acts (Wilson Act, 26 Stat. 313, or the Webb-Kenyon Act, 37 Stat. 699, 27 U.S. C.A. §§ 121, 122 and note following section 1), or the recent cases dealing with

ters case (128 F.Supp. 457), the Court is of the opinion that defendant's motion for summary judgment should be granted.

local jurisdiction over foreign insurance companies; Travelers Health Association v. Commonwealth of Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154; French v. Gibbs Corporation, 2 Cir.1951, 189 F.2d 787.